UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY BLACKBURN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>STURGEON SERVICES INTERNATIONAL, INC., and ADRIANN ROSALES,<br><br>　　　　Defendants. | Case No.: 1:13-cv-00054 - JLT<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>(Doc. 36) |

Defendant Sturgeon Services International, Inc., ("Defendant" or "Sturgeon") seeks partial summary judgment against Plaintiff Anthony Blackburn ("Plaintiff"). (Doc. 26.) Plaintiff filed his opposition to the motion on December 6, 2013 (Doc. 37), to which Defendant filed a reply on December 30, 2013 (Doc. 39). The Court heard the oral arguments of the parties on January 13, 2014. For the following reasons, Defendant's motion for partial summary judgment is **GRANTED**.

## I.     Factual and Procedural History

Plaintiff initiated this action by filing a complaint against Sturgeon Services International, Inc., and Adriann Rosales on January 11, 2013. (Doc. 1.) He filed a First Amended Complaint against the defendants on April 15, 2013 (Doc. 16), which is the operative pleading. Plaintiff alleges that he was employed by Sturgeon beginning in October 2006 when he was hired on a temporary basis, and that he became a full-time employee of Sturgeon around January 2007. (Doc. 26 at 3, ¶ 10.) According to Plaintiff, he performed his duties in "an exemplary" manner and Sturgeon "gave Plaintiff multiple

raises and promoted him to the position of foreman." (*Id., ¶* 11.)

Plaintiff reports that in November 2011, he "informed Sturgeon that he was expecting a baby and intended to take leave to bond with his child after his baby was born." (Doc. 16 at 3, ¶ 12.) He alleges the staff in the Human Resources Department told him "he should simply inform his immediate supervisor of which days he intended to take off," so Plaintiff told his supervisor, Bill Carroll, of his intentions. (*Id.* at 4, ¶¶ 12-13.) Plaintiff asserts Mr. Carroll told him "it would be very hard to make do without [Plaintiff] at work if he took leave to bond with his child for multiple weeks" and suggested "Plaintiff take leave on an intermittent, as-needed basis so that Plaintiff could maintain his position and minimize the disruption" to the company. (*Id.*, ¶ 13.)

According to Plaintiff, his son was born on July 27, 2012, which was one of his regular days off of work. (Doc. 16 at 4, ¶ 14.) Although Plaintiff asked company employees not to call him during the time he was away for the birth of his son, Sturgeon "repeatedly contacted Plaintiff . . . asking [him] to perform various work-related tasks." (*Id.*) Plaintiff returned to work the week after his son's birth, and Sturgeon instructed him "to report to work on Friday and Saturday, which were Plaintiff's normal days off." (*Id.*, ¶ 15.) Plaintiff alleges he objected to this, but the company "insisted that [he] report to work." (*Id.*) In addition, he asserts Sturgeon "repeatedly" called "asking him to come in to work on days when Sturgeon had previously agreed to allow Plaintiff to take leave." (*Id.*, ¶ 16.) Plaintiff alleges that when he "exercised his right to leave to bond with his baby, supervisory employees and managing agents of [Sturgeon] disparaged Plaintiff for requesting leave." (*Id.*)

Plaintiff reports he complained to Mr. Carroll about a disparaging email sent by a regional manager and "other retaliatory actions" by Sturgeon, and stated he did not want to be "asked to come into work on days when he was on leave to bond with his baby." (Doc. 16 at 4-5, ¶ 17.) Plaintiff told Mr. Carroll he would go to human resources if these concerns were not addressed, and Mr. Carroll "advised Plaintiff not to speak to the Human Resources Department." (*Id.* at 5, ¶ 17.)

On August 8, 2012, Plaintiff spoke with Adrianne Rosales, "the highest ranking employee in Sturgeon's Human Resources Department," regarding his concerns and Plaintiff "informed [her] that he needed to take bonding leave due to the medical condition of his child's mother." (*Id.* at 2, 5.) He alleges that he stayed home from work on August 9, 2012, and believed Sturgeon was investigating his

complaints. (*Id.* at 5, ¶22.) However, managerial employees contacted Plaintiff and asked him to report to a job site in Los Angeles the next day. (*Id.*)

Plaintiff alleges that on August 10, 2012, Ms. Rosales contacted Plaintiff while he was working in Los Angeles, and ordered him to return to the office in Bakersfield. (Doc. 16 at 6, ¶ 23.) Plaintiff met with Ms. Rosales and Mr. Carroll upon his arrival, and he alleges that during the meeting Ms. Rosales "accused Plaintiff of wrongdoing and terminated [his] employment with Sturgeon, effective immediately." (*Id.*, ¶ 24.) According to Plaintiff, Mr. Carroll stated after his termination: "This is why you never should have called HR." (*Id.*, ¶ 28.) In addition, Plaintiff alleges Ms. Rosales "falsely told multiple individuals that Plaintiff was a drug user, that he had come to work under the influence of illegal drugs, and/or that he was fired for failing a drug test" and that "Plaintiff had used profanity against her and refused to return company property after he was terminated." (*Id.* at 7, ¶ 30.)

Based upon the foregoing facts, Plaintiff alleged the following causes of action against Sturgeon: (1) interference with and failure to provide leave in violation of the Family and Medical Leave Act ("FLMA"), 29 U.S.C. § 2615(a); (2) retaliation in violation of FLMA, 29 U.S.C. § 2615(b); (3) interference with and failure to provide leave in violation of Cal. Gov't Code § 12945.2; (4) sex discrimination in violation of Cal. Gov't Code § 12940; (5) retaliation in violation of Cal. Gov't Code § 12940; (6) failure to prevent and investigate discrimination in violation of Cal. Gov't Code § 12940(j) and (k); and (7) wrongful termination in violation of public policy. (*See* Doc. 16 at 7-17.) In addition, Plaintiff states Sturgeon and Ms. Rosales are liable for intentional infliction of emotional distress and defamation. (*Id.* at 17-20.) Defendants filed their answers to the First Amended Complaint on May 6, 2013. (Docs. 18-19.)

Though not alleged in his complaint, apparently in discovery, Plaintiff has claimed that he suffered an injury while working at a company, called Pivox. (UMF 3, 5, 10, 11, 12) He claims that he slipped and fell during wet rainy conditions and injured his knee. *Id*. He claims that had he never been fired from Sturgeon he would not have been working at Pivox and, hence, would not have been injured.

On November 15, 2013, Defendant Sturgeon filed the motion for summary adjudication now pending before the Court, asserting Plaintiff is not entitled to back pay from Sturgeon and is unable to recover damages for emotional distress, medical bills, or pain and suffering. (Doc. 36.) Plaintiff filed

3

his opposition on December 6, 2013 (Doc. 37), which he supplemented on December 17, 2013 (Doc. 38.)  Defendant filed a brief in reply on December 20, 2013.  (Doc. 39.)  For purposes of resolving Defendant's motion, "the parties agree to assume that the termination was unlawful." (Doc. 37 at 7.)

## II.     Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Accordingly, summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In addition, Rule 56 permits the Court to grant partial summary judgment, or summary adjudication, when there is no genuine issue of material fact as to a particular claim or portion of a claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

A party seeking summary adjudication or summary judgment bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  The moving party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477

1  U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

2  If the moving party meets its initial burden, the burden then shifts to the opposing party to
3  present specific facts that demonstrate there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e);
4  *Matsuhita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some
5  metaphysical doubt as to the material facts." *Id.* at 587.  The party is required to tender evidence of
6  specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention
7  that a factual dispute exits. *Id.* at 586, n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not
8  required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed
9  factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth
10 at trial." *T.W. Electrical Serv. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).
11 However, "failure of proof concerning an essential element of the … case necessarily renders all other
12 facts immaterial." *Celotex*, 477 U.S. at 322.

13 The Court must apply standards consistent with Rule 56 to determine whether the moving party
14 demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law.
15 *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary
16 judgment, the Court can consider only admissible evidence. *Orr v. Bank of America, NT & SA*, 285
17 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854
18 F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the
19 nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*,
20 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**III.    Evidentiary Objections**

    **A.    Plaintiff's objections**

Defendant filed a "Separate Statement of Undisputed Facts in Support of Sturgeon's Motion for Partial Summary Judgment." Plaintiff objects to the following portions:

> 4. No doctor has opined that any of Blackburn's ailments resulted from the termination of his employment at Sturgeon: all of Blackburn's physical ailments are the result of the injury suffered on the job at Pivox.
>
> 5. After his injury on the job at Pivox, Blackburn reported to a physician he was not suffering from depression, nervousness, mood swings or sleep disturbances.

8. Blackburn is suffering from insomnia caused by the painkillers he takes as part of his treatment for his injuries suffered at Pivox.

(Doc. 37-5 at 2, quoting Doc. 36.) Significantly, however, the Court has not relied on these facts, and as such Plaintiff's objections to these statements are **MOOT**.

In addition, Plaintiff objects to the statement in that he "is still employed by Pivox but not working and receiving workers compensation benefits" based upon the collateral source rule. (Doc. 37-4 at 2.) Significantly, however, a similar statement is in the Joint Statement of Undisputed Facts, which was authorized by Plaintiff's counsel. (*See* Doc. 36-2 at 3, UMF 11.) Thus, Plaintiff's objection to the statement is **OVERRULED**.

### B. Defendant's objections

Defendant objects to several statements in the declarations filed by Plaintiff and Morgan Ricketts for lack of personal knowledge, hearsay, and impermissible lay opinion. (Doc. 39-2.) Rule 602 provides a witness may not testify unless "the witness has personal knowledge of the matter." Fed. R. Evid. 602. A lay witness may testify only as to those opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Significantly, however, the statements identified by Defendant, which relate primarily to the weather conditions the day Plaintiff fell at Pivox Corporation and how the company reacted to the injury, are not relevant to the issues before the Court. Therefore, Defendant's objections are **MOOT**.

### C. Speculative and conclusory statements

To the extent that statements offered by either party are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis. *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp.2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context.") (citation omitted, emphasis in original).

///

## IV. Undisputed Material Facts

Sturgeon is a company that "provides oil field construction and maintenance services." (UMF 3.) At the time of Plaintiff's termination on August 10, 2012, he worked as a foreman for Sturgeon. (UMF 4.) Plaintiff "had stop work authority, meaning that if he believed the conditions were unsafe due to weather or other reasons, he could stop work on the jobsite." (UMF 8.)

After his termination, Plaintiff obtained employment through an agency that sent him to work for Ken Small Industries. (Blackburn Decl. ¶ 19.) Plaintiff continued to look for permanent work, and on October 8, 2012, Plaintiff began to work as an operator for Pivox Corporation, which "provides oil field construction and engineering services." (Blackburn Decl. ¶ 19; UMF 5-6.) On October 22, 2012, Plaintiff reported for work at a Pivox location, which he "believed . . . was unsafe due to the weather conditions." (UMF 9.) Plaintiff and his coworkers complained to the foreman regarding the "wind and rain" but were directed to work. (Doc. 37-2 at 8, Blackburn Decl. ¶ 29.) Around 8:30 a.m., Plaintiff "fell while walking at the jobsite, which caused him to suffer a broken and dislocated knee, a torn anterior cruciate ligament, and a fractured femur." (UMF 10.) As a result of his injuries, Plaintiff "has incurred medical expenses and experienced pain, suffering, and emotional distress." (UMF 12.)

Plaintiff remains employed by Pivox but is not able to work. (UMF 11.) As of November 1, 2012, Plaintiff's ability to work is classified as "[m]odified duty with restrictions of sit down job only, must use crutches to ambulate, no driving commercial vehicles." (UMF 18.) Consequently, Plaintiff is on Temporary Total Disability Status and he "currently receives workers compensation benefits." (UMF 11, 19.) If Plaintiff suffered the same injury while employed by Sturgeon, he "would not have been entitled to leave with pay; he would have been on temporary disability status with workers' compensation." (UMF 20.)

## V. Discussion and Analysis

Because Defendant's motion for summary adjudication relates to the damages that may be recovered, the parties agree the Court should presume, for this motion only, the termination from Sturgeon was unlawful. (Doc. 36 at 8; Doc. 37 at 7.) Even assuming the termination was unlawful, Defendant argues (1) "Sturgeon is entitled to judgment in its favor eliminating the damages claims for emotional distress, medical bills, and pain and suffering" and (2) Sturgeon is "entitled to judgment in

its favor eliminating any backpay damages from the date of injury until Blackburn is returned to normal duties." (Doc. 36 at 8-9.)

### A. Superseding intervening cause

To recover damages for the physical and emotional injury Plaintiff suffered when he fell at work in October 2012, Plaintiff must demonstrate his injury would not have occurred "but for" the wrongful termination to be entitled damages or backpay related to his physical injury. (*See* Doc. 36 at 9, citing Rest. 3rd Torts: Phys. & Emot. Harm § 26 (2010); Doc. 37 at 13, citing *Estate of Reynolds v. Dole*, 1990 WL 112283, p. *42, *aff'd sub. nom. Estate of Reynolds v. Martin*, 985 F. 2d 470 (9th Cir. 1993)). Here, however, Plaintiff fails to carry this burden.

Plaintiff argues his injuries "would not have occurred if he were still a foreman" at Sturgeon, and had not been employed by Pivox. (Doc. 37 at 13, emphasis omitted.) Plaintiff asserts: "The only reason [he] was not working as a foreman that day was because he was terminated from his foreman position at Sturgeon," and as a result "Sturgeon concedes that [he] would not have been injured had it not terminated him." (*Id.*) However, Sturgeon makes no such concession. Rather, Sturgeon argues the company "was not the cause in fact, or the legal cause, of [Plaintiff's] injury at Pivox." (Doc. 36 at 9, emphasis omitted.)

As Defendant observes, "a plaintiff must demonstrate both actual and legal cause," because "there can be no liability for the wrongful discharge without a causal connection between the discharge and the injury." (Doc. 36 at 11, quoting *Jasper v. H. Nizam, Inc.*, 764 N.W. 2d 751, 770 (Iowa 2009)). Where there is an intervening or superseding event or cause, a plaintiff stating a tort claim such as wrongful termination fails to demonstrate a causal connection and is not entitled to damages for the injury. *See Powell v. Standard Brands Paint Co.,* 166 Cal.App.3d 357, 364 (1985). A court must determine "whether the later cause of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable." *Akins v. Cnty. of Sonoma*, 67 Cal.2d 185, 199 (1967). If the answer to either inquiry is in the affirmative, the defendant remains liable. *Id.*

In *Farr v. NC Mach. Co.*, 186 F.3d 1165, 1169-1170 (9th Cir. 1999), the Ninth Circuit set forth the requirements of the Second Restatement as to whether a subsequent act is a superseding cause. The

court observed,

> The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:
>
> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>
> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>
> (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
>
> (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
>
> (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion."

When Plaintiff slipped in October 2012, he suffered a knee injury. Such an injury is different in kind from the emotional and financial damage that normally occurs from a wrongful termination decision. In fact, the Court cannot imagine a situation where a knee injury would be a normal consequence of suffering wrongful termination. There is no indication that Sturgeon played any role in the wet conditions or the decision to continue to work on the day Plaintiff fell. Indeed, the decision to work despite the conditions is fully attributable to Plaintiff's employer at the time. Plaintiff contends the decision to continue to work was wrongful and the Court has no factual basis to doubt this assertion. Given these facts, it is clear that Sturgeon was not a legal cause Plaintiff's injury. Thus, he is not entitled to damages from Sturgeon related to the injuries suffered while working for Pivox.

**B.    Backpay**

Plaintiff contends that "even if Sturgeon was not the but-for cause of [his] injury, Sturgeon is still responsible for [his] lost wages." (Doc. 37 at 14, emphasis omitted.) As to the federal claims, the "general rule" is that "an employer is not liable for backpay during periods that an improperly discharged employee is unavailable for work due to a disability." *EEOC v. Timeless Invs., Inc.*, 734

F.Supp.2d 1035, 1059 (E.D. Cal. Aug. 13, 2010) (citing *Canova v. NLRB*, 708 F.2d 1498, 1505 (9th Cir. 1983)).

In *EEOC*, one plaintiff claimed damages for lost wages despite that he had sought and was awarded, social security benefits based upon his inability to work. *Id*. at 1059. In rejecting that damages for lost wages should be awarded, the Court noted, "a plaintiff should not be able to receive back pay for a period when he was unable to work for reasons unrelated to the defendant's conduct." *Id.* Only where the defendant's discriminatory conduct caused the disability at issue is back pay awardable. *Id.* (citing *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999); *McKenna v. City of Philadelphia*, 636 F. Supp. 2d 446, 465 (E.D. Pa. 2009)).

Despite this authority, Plaintiff relies upon *Martin v. Dep't of Air Force*, 184 F.3d 1366, 1370 (Fed. Cir. 1999), to argue that he is entitled to back pay despite that he remains unable to work. In *Martin*, the plaintiff had been an aircraft mechanic but was terminated from that position. *Id*. at 1367. He worked at several different jobs after the firing and was finally hired by a car dealership as a "wrecker driver/mechanic." *Id*. at 1367-1368. One day at work, another employer back-ended the car the plaintiff was driving. *Id.* He suffered injuries for which he was provided workers compensation benefits. *Id*. When the plaintiff was reinstated to his job as an aircraft mechanic, he was denied back pay under the Back Pay Act for the period of time he received workers compensation benefits. *Id*. at 1368.

In considering his administrative claim, the agency noted that under the Act, back pay could not be awarded to an employee unless he was "ready, willing, and able to perform his or her duties . . ." *Martin* at 1368-1369. The agency determined that any other interpretation would provide the employee with a windfall. *Id*. at 1369. On appeal, the Court interpreted the Back Pay Act and found that the purpose of the Act was to make the employee whole and to restore the wrongfully discharged employee to the position he would have been in had the termination not occurred. <u>Id</u>. at 1372. In determining Martin should receive back pay, the court held, "Martin's injury was closely related to the nature of his interim employment and was not a 'hazard of living generally.' In order to be made whole, as is the

intent of the Back Pay Act[1], Martin should be awarded back pay for the time he suffered an 'abnormal' interim work-related injury." *Id*. at 1372.

The *Martin* court relied upon *Am. Mfg. Co. of Texas*, 167 NLRB 520, 522 (1967), in which the plaintiff had been a truck driver who hauled "pumping equipment, pipe, military shells, scrap metal, bentonite "mud," and billet steel." *Id*. at 523. His replacement position, as a truck driver, required him to "haul and unload pipe by spilling it to the ground." *Id*. One day, when attempting to "spill" his load, a section of pipe gave way and he had to jump to safety. *Id*. In doing so, he fractured his foot and was unable to work for a month. *Id*. The Board observed,

> Jumping off collapsing loads is not an everyday occurrence and it is questionable, at best, that Wallace would have been required to do so absent his discharge. It is not probable, even though it was possible, that he could have been in that position in any event, and as this particular injury is closely related to the nature of the interim employment, we shall not exclude this period of Wallace's disability from backpay. However, since we are not tolling his backpay for that period, that portion of the workmen's compensation payments to Wallace which were in replacement of lost wages shall be included in his interim earnings and be deducted from the gross backpay.

*Id*.

Here, there are no facts which explain the circumstances of Plaintiff's injury. The undisputed facts proffered by Plaintiff indicate only that he was injured about 30 minutes into the workday after he slipped on a wet piece of plastic (PUDF 8, 9) under which Plaintiff "guess[ed] . . . was a mudhole." (Doc. 37-2 at 8 (Blackburn Decl. ¶ 33)) Plaintiff provides no explanation as to what work he was doing the day he was injured or how his slipping was related to that work. Plaintiff explains only that he was hired as an equipment operator but his new employer wanted to get to "know [him] and his abilities" before allowing him to work as an operator, which, Plaintiff explains, is what he would have done if the positions were reversed. *Id*. at 6 (Blackburn Decl. ¶ 21), While his employer was getting to know him, Plaintiff was assigned "to pick up asphalt, sweep and keep the job site clean, dig ditches, put up fencing, organize the storage area, went to Home Depot and [got] supplies" and he "operate[d] an excavator for about four hours per week." *Id*. at 7-8 (Blackburn Decl. ¶ 21).

As to the incident, Plaintiff reports only, " . . . around 8:30 a.m., I slipped and fell on plastic we

---

[1] There is no showing that Plaintiff is covered by the Back Pay Act and, given he was employed by a private, non-governmental company, it seems apparent he is not so covered. 5 U.S.C. § 5596.

had laid down over the wet surface, because I guess there was a mudhole underneath it, and I heard a popping sound in my leg." *Id*. Seemingly, Plaintiff contends that the fall occurred, not because of rain water collecting on the surface of the plastic, but because the plastic was placed on a mudhole. Exactly how or why this caused the fall is not explained.

Plaintiff fails to provide sufficient factual information that his injury occurred due to his performing acts closely associated with his work on that day. At most, Plaintiff alleges only that he fell while on the job site. Whether he was on his way to the coffee truck, to use the restroom or was in process of actually performing the duties of his job is not shown. Even still, Plaintiff offers little explanation why the Court should depart from the authority from this District and Circuit and the Court cannot find a reasoned basis to accept the analysis of *Martin*. In the Court's view, this authority offers little in the way of logic[2] and, seemingly, ignores well-established rules of causation. Here, the Court does not find Defendant was the legal cause of Plaintiff's injury. Thus, during the period of disability, Plaintiff was/is unavailable to work and cannot recover lost wages for this time for the federal claims.

On the other hand, Plaintiff raises claims under state law as well and argues that the award of back pay as to those causes should be evaluated under state law. According to Plaintiff, pursuant to California law he is entitled to recover back pay because when an employer wrongfully terminates an employee, "the employer cannot take advantage of the fortuitous circumstance of a disability of the employee during the period of discharge without first having purged itself of its own wrong by offering to reinstate the employee." (Doc. 37 at 16, quoting *Mayer v. Multistate Legal Studies, Inc.*, 52 Cal. App. 4th 1428, 1434-1435 (1997)).

In general, under California law, backpay is equitable relief that "serves to make an employee whole for the employer's wrongdoing." *Davis v. Los Angeles Unified School Dist. Personnel Com.*, 152 Cal.App.4th 1122, 1133 (2007). It provides the employee what he would have earned had he not been terminated. *Id*. at 1133 quoting *Lisec v. United Airlines, Inc.*, 10 Cal.App.4th 1500, 1503 (1992).

---

[2] Rather than considering the legal standard for causation, *Martin* imposes liability on the former employer for back pay for an employee hurt at a replacement job but does impose liability as to an employee who cannot find replacement work despite diligence; this makes no sense. Neither employee would be at the place where the injury occurred or doing the thing which gave rise to the injury, had each not been fired.

12

Consequently, a wrongfully terminated employee "will not be allowed back pay during any periods of disability." *Davis*, 152 Cal. App. 4th 1134. The court explained "an employer is not liable for backpay during periods that an improperly discharged employee is unavailable for work due to a disability," but "full backpay may be awarded where the disability is a result of the employer's wrongful conduct." *Id.* at 1134-35 (citing, *e.g., Canova v. NLRB*, 708 F.2d 1498, 1505 (9th Cir. 1983); *Martin v. Dep't of Air Force*, 184 F.3d 1366, 1371–1372 (Fed. Cir. 1999)).

The *Davis* court considered its ruling made sixty years before in *Ahlstedt v. Board of Education,* 79 Cal.App.2d 845 (1947). In *Ahlstedt,* the court recognized two principles:

> First, a discharged employee is entitled to full backpay if his or her illness is caused by the employer's wrongful conduct. Second, if the employee remains ready, willing, and able to return to work while ill, the employer's wrongful conduct—not the employee's illness—is the cause of the lost earnings, and the employer is not prejudiced by having to make full restitution.

*Davis*, 152 Cal. App. 4th at 1137. Explaining its prior holding in *Ahlstedt*, the *Davis* court stated: "[i]n *Ahlstedt*, we did not mean to suggest that in *all* cases, the discharge is the cause of the employee's lost earnings or that the employer is liable for full backpay regardless of events occurring after the discharge." *Id.* at 1138 (emphasis in original). However, *Davis* noted that this was the incorrect interpretation given to *Ahlstedt* by the Fifth District Court of Appeal in *Carroll*, 31 Cal.App.3d 561 (1973).

In *Carroll*, a county employee had been discharged and during the period before his reinstatement, he spent 147 days in jail for public drunkenness. *Carroll*, 31 Cal.App.3d at 564. In arguing back pay should not be awarded, the county noted that the employee could not have reported to work and would not have been paid during that time even if he had not been discharged. *Id*. at 565. However, *Carroll* determined the plaintiff was entitled to his full salary, including the time he was incarcerated, minus the wages he received for working while in jail. *Id.* at 566-567. *Davis* rejected the rationale of *Carroll*, by stating,

> We agree with *Carroll* that an employer cannot take advantage of a discharged employee's disability, at least where the disability is caused by the discharge. Further, courts should hesitate to adopt a rule that encourages a discharged employee to stand idly by, hoping to be reinstated, as opposed to seeking a comparable job with another employer. Yet we fail to see how *Carroll* furthered either of those interests. The employee's incarceration was not attributable to his discharge. And the denial of lost earnings during jail time would not encourage discharged employees to avoid other employment. If anything, it would discourage them from committing crimes. Nor do

> we agree with *Carroll's* statement that an employee is entitled to full back pay unless and until an offer of reinstatement is made. That notion disregards well recognized principles of causation, gives the employee a windfall, and ignores the circumstances that may exist between the time of discharge and reinstatement. A back pay award should reflect the particular facts of the case. To the extent Carroll is inconsistent with *Ahlstedt*, we decline to follow it. (Cf. *Hoffman Plastic Compounds, Inc. v. NLRB* (2002) 535 U.S. 137, 147–152, 122 S.Ct. 1275, 1282–1285 [employees wrongfully selected for layoff were not entitled to back pay where they were not legally authorized to work in United States; award of back pay would encourage individuals to violate federal immigration laws].)

*Davis*, 152 Cal. App. 4th at 1138-1139

California's First District Court of Appeal addressed similar issues in *Mayer v. Multistate Legal Studies, Inc.*, 52 Cal. App. 4th 1428 (1997). The court determined that an employer is entitled to a set-off for the amount of disability payments that were intended to compensate the wrongfully discharged employee for lost wages. Notably, in *Mayer*, the evidence did not establish the employee was totally disabled though the physical manifestations of the chemotherapy treatments left him in a condition which made it unlikely he could obtain substitute work. *Id*. at 1436. After discussing *Ahlstedt* and *Carroll*, the court noted,

> . . . we are convinced that the equities in the present case militate strongly against permitting plaintiff's receipt of disability compensation to wholly preclude any award of lost wages from defendant. First, to accept the trial court's ruling would force future employees finding themselves in positions similar to this plaintiff to make an unacceptable election, i.e., accept benefits needed for survival in the present or pursue a more lucrative claim against the employer that may not come to fruition for several years. This unacceptable choice contravenes the policies underlying the Legislature's decision to make disability compensation available in the first place. "The purpose of [disability compensation] is to compensate in part for the wage loss sustained by individuals unemployed because of sickness or injury and to reduce to a minimum the suffering caused by unemployment resulting therefrom. This part shall be construed liberally in aid of its declared purpose to mitigate the evils and burdens which fall on the unemployed and disabled worker and his family." (Unemployment Ins.Code, § 2601.)

*Id*. at 1435-1436. Thus, the *Mayer* court awarded back pay though reduced it by the total of the disability payments, which represented wages. *Id*. at 1436.

Significantly, in contrast to *Mayer*, Plaintiff's injury left him completely unable to work at least for a period of time. Likewise, Plaintiff's situation is different from that in *Ahlstedt* where the wrongful termination caused the illness which made the employee unable to work. Moreover, the Court agrees

that the rationale of *Carroll* is faulty in that it seeks to impose liability for damages on a defendant who did not legally cause the disability.

This determination is consistent with California law which precludes backpay if it "would provide the plaintiff with an unjustified windfall." *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 223 (2013). The Fair Employment and Housing Act "does not provide authorization to award damages that reflect the significant possibility of a windfall." *Id.* at 234.

Here, Plaintiff suffered an injury which was unrelated to the termination decision of Sturgeon. Thus, awarding him backpay for the period of disability caused by the fall would constitute a windfall for Plaintiff.[3] Thus, Plaintiff is not entitled to backpay damages from Defendant for his period of disability for his claims arising under California law.

## VI.     Conclusion and Order

Defendant has carried its burden to demonstrate that even if Plaintiff's termination from Sturgeon was unlawful, Plaintiff cannot show a causal connection between Sturgeon's action and his injury at Pivox. *See Celotex*, 477 U.S. at 322. Therefore, the Court holds that Plaintiff is not entitled to compensatory damages for his period of disability resulting from the injury and is not entitled to back pay during this period. Therefore, Defendant's motion for partial summary judgment is **GRANTED.**

IT IS SO ORDERED.

Dated:   **January 21, 2014**              **/s/ Jennifer L. Thurston**
                                                                     UNITED STATES MAGISTRATE JUDGE

---

[3] Notably, when he started working for Pivox, he was earning the same hourly rate as he earned at the time he was terminated from Sturgeon. (Doc. 37-2 at 6 [Plaintiff's Dec. ¶ 20]) Because there are factual questions that cannot be resolved by the Court, the Court cannot find—as Plaintiff requests—that the job with Pivox was not comparable to the one he held at Sturgeon such to preclude any reduction in damages for the salary earned while at Pivox. *Villacorta v. Cemex Cement, Inc.*, 221 Cal.App.4th 1425, 1428-1429 (2013).