# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY BLACKBURN,<br><br>          Plaintiff,<br><br>     v.<br><br>STURGEON SERVICES INTERNATIONAL, INC., and ADRIANN ROSALES,<br><br>          Defendants. | Case No.: 1:13-cv-00054 - JLT<br><br>AMENDED ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>(Doc. 36) |

Defendant Sturgeon Services International, Inc., ("Defendant" or "Sturgeon") seeks partial summary judgment against Plaintiff Anthony Blackburn ("Plaintiff"). (Doc. 26.) Plaintiff filed his opposition to the motion on December 6, 2013 (Doc. 37), to which Defendant filed a reply on December 30, 2013 (Doc. 39). The Court heard the oral arguments of the parties on January 13, 2014 and granted Defendant's motion for partial summary judgment soon thereafter. (Doc. 41)

Here, the Court exercises its authority to revise the order, as a non-final order. In doing so, however, the result in unchanged.

## I.     Federal Rules of Civil Procedure 54(b) allows the court to revise a non-final order

Federal Rules of Civil Procedure 54(b) vests in the Court the authority to revise a non-final order. This rule provides in part,

> [A]any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

1

Fed. R. Civ. P. 54(b). In analyzing this authority, in *Willis v. Mullins*, 809 F.Supp.2d 1227, 1233 (E.D. Cal. 2011), the Court held,

> With respect to non-final orders, such as the Partial Judgment, the Ninth Circuit has recognized that as long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient. This inherent power is grounded in the common law and is not abridged by the Federal Rules of Civil Procedure. In addition to the inherent power to modify a nonfinal order, Rule 54(b) authorizes a district court to revise a non-final order at any time before entry of a judgment adjudicating all the claims....As to inherent authority, a district court may reconsider and modify an interlocutory decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of controlling law. But a court should generally leave a previous decision undisturbed absent a showing that it either represented clear error or would work a manifest injustice. Rule 54(b) does not address the standards which a court should apply when assessing a motion to modify an interlocutory order; however, courts look to the standards under Rule 59(e) and Rule 60(b) for guidance.

Quoting *Jadwin v. County of Kern*, 2010 WL 1267264, *9, (E.D.Cal. Mar. 31, 2010), citations and quotations omitted.[1] On its own motion, the Court here revises its prior order granting partial summary judgment.

## II.     Factual and Procedural History

Plaintiff initiated this action by filing a complaint against Sturgeon Services International, Inc., and Adriann Rosales on January 11, 2013. (Doc. 1.) He filed a First Amended Complaint against the defendants on April 15, 2013 (Doc. 16), which is the operative pleading. Plaintiff alleges that he was employed by Sturgeon beginning in October 2006 when he was hired on a temporary basis, and that he became a full-time employee of Sturgeon around January 2007. (Doc. 26 at 3, ¶ 10.) According to Plaintiff, he performed his duties in "an exemplary" manner and Sturgeon "gave Plaintiff multiple raises and promoted him to the position of foreman." (*Id., ¶* 11.)

Plaintiff reports that in November 2011, he "informed Sturgeon that he was expecting a baby and intended to take leave to bond with his child after his baby was born." (Doc. 16 at 3, ¶ 12.) He alleges the staff in the Human Resources Department told him "he should simply inform his immediate supervisor of which days he intended to take off," so Plaintiff told his supervisor, Bill Carroll, of his

---

[1] Notably, a motion to reconsider under Rule 54(b) is not a vehicle for parties to make legal new arguments that could have been raised in the original briefs. See *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir.2001).

intentions. (*Id.* at 4, ¶¶ 12-13.) Plaintiff asserts Mr. Carroll told him "it would be very hard to make do without [Plaintiff] at work if he took leave to bond with his child for multiple weeks" and suggested "Plaintiff take leave on an intermittent, as-needed basis so that Plaintiff could maintain his position and minimize the disruption" to the company. (*Id.*, ¶ 13.)

      According to Plaintiff, his son was born on July 27, 2012, which was one of his regular days off of work. (Doc. 16 at 4, ¶ 14.) Although Plaintiff asked company employees not to call him during the time he was away for the birth of his son, Sturgeon "repeatedly contacted Plaintiff . . . asking [him] to perform various work-related tasks." (*Id.*) Plaintiff returned to work the week after his son's birth, and Sturgeon instructed him "to report to work on Friday and Saturday, which were Plaintiff's normal days off." (*Id.*, ¶ 15.) Plaintiff alleges he objected to this, but the company "insisted that [he] report to work." (*Id.*) In addition, he asserts Sturgeon "repeatedly" called "asking him to come in to work on days when Sturgeon had previously agreed to allow Plaintiff to take leave." (*Id.*, ¶ 16.) Plaintiff alleges that when he "exercised his right to leave to bond with his baby, supervisory employees and managing agents of [Sturgeon] disparaged Plaintiff for requesting leave." (*Id.*)

      Plaintiff reports he complained to Mr. Carroll about a disparaging email sent by a regional manager and "other retaliatory actions" by Sturgeon, and stated he did not want to be "asked to come into work on days when he was on leave to bond with his baby." (Doc. 16 at 4-5, ¶ 17.) Plaintiff told Mr. Carroll he would go to human resources if these concerns were not addressed, and Mr. Carroll "advised Plaintiff not to speak to the Human Resources Department." (*Id.* at 5, ¶ 17.)

      On August 8, 2012, Plaintiff spoke with Adrianne Rosales, "the highest ranking employee in Sturgeon's Human Resources Department," regarding his concerns and Plaintiff "informed [her] that he needed to take bonding leave due to the medical condition of his child's mother." (*Id.* at 2, 5.) He alleges that he stayed home from work on August 9, 2012, and believed Sturgeon was investigating his complaints. (*Id.* at 5, ¶22.) However, managerial employees contacted Plaintiff and asked him to report to a job site in Los Angeles the next day. (*Id.*)

      Plaintiff alleges that on August 10, 2012, Ms. Rosales contacted Plaintiff while he was working in Los Angeles, and ordered him to return to the office in Bakersfield. (Doc. 16 at 6, ¶ 23.) Plaintiff met with Ms. Rosales and Mr. Carroll upon his arrival, and he alleges that during the meeting Ms.

3

Rosales "accused Plaintiff of wrongdoing and terminated [his] employment with Sturgeon, effective immediately." (*Id.*, ¶ 24.) According to Plaintiff, Mr. Carroll stated after his termination: "This is why you never should have called HR." (*Id.*, ¶ 28.) In addition, Plaintiff alleges Ms. Rosales "falsely told multiple individuals that Plaintiff was a drug user, that he had come to work under the influence of illegal drugs, and/or that he was fired for failing a drug test" and that "Plaintiff had used profanity against her and refused to return company property after he was terminated." (*Id.* at 7, ¶ 30.)

Based upon the foregoing facts, Plaintiff alleged the following causes of action against Sturgeon: (1) interference with and failure to provide leave in violation of the Family and Medical Leave Act ("FLMA"), 29 U.S.C. § 2615(a); (2) retaliation in violation of FLMA, 29 U.S.C. § 2615(b); (3) interference with and failure to provide leave in violation of Cal. Gov't Code § 12945.2; (4) sex discrimination in violation of Cal. Gov't Code § 12940; (5) retaliation in violation of Cal. Gov't Code § 12940; (6) failure to prevent and investigate discrimination in violation of Cal. Gov't Code § 12940(j) and (k); and (7) wrongful termination in violation of public policy. (*See* Doc. 16 at 7-17.) In addition, Plaintiff states Sturgeon and Ms. Rosales are liable for intentional infliction of emotional distress and defamation. (*Id.* at 17-20.) Defendants filed their answers to the First Amended Complaint on May 6, 2013. (Docs. 18-19.)

Though not alleged in his complaint, apparently in discovery, Plaintiff has claimed that he suffered an injury while working at a company, called Pivox. (UMF 3, 5, 10, 11, 12) He claims that he slipped and fell during wet rainy conditions and injured his knee. *Id*. He claims that had he never been fired from Sturgeon he would not have been working at Pivox and, hence, would not have been injured.

On November 15, 2013, Defendant Sturgeon filed the motion for summary adjudication now pending before the Court, asserting Plaintiff is not entitled to back pay from Sturgeon and is unable to recover damages for emotional distress, medical bills, or pain and suffering. (Doc. 36.) Plaintiff filed his opposition on December 6, 2013 (Doc. 37), which he supplemented on December 17, 2013 (Doc. 38.) Defendant filed a brief in reply on December 20, 2013. (Doc. 39.) For purposes of resolving Defendant's motion, "the parties agree to assume that the termination was unlawful." (Doc. 37 at 7.)

### III.   Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to

4

see whether there is a genuine need for trial." *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Accordingly, summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In addition, Rule 56 permits the Court to grant partial summary judgment, or summary adjudication, when there is no genuine issue of material fact as to a particular claim or portion of a claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

A party seeking summary adjudication or summary judgment bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  The moving party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that demonstrate there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587.  The party is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586, n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the … case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary judgment, the Court can consider only admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**IV.     Evidentiary Objections**

**A.      Plaintiff's objections**

Defendant filed a "Separate Statement of Undisputed Facts in Support of Sturgeon's Motion for Partial Summary Judgment." Plaintiff objects to the following portions:

   4. No doctor has opined that any of Blackburn's ailments resulted from the termination of his employment at Sturgeon: all of Blackburn's physical ailments are the result of the injury suffered on the job at Pivox.

   5. After his injury on the job at Pivox, Blackburn reported to a physician he was not suffering from depression, nervousness, mood swings or sleep disturbances.

   8. Blackburn is suffering from insomnia caused by the painkillers he takes as part of his treatment for his injuries suffered at Pivox.

(Doc. 37-5 at 2, quoting Doc. 36.)  Significantly, however, the Court has not relied on these facts, and as such Plaintiff's objections to these statements are **MOOT**.

In addition, Plaintiff objects to the statement in that he "is still employed by Pivox but not working and receiving workers compensation benefits" based upon the collateral source rule. (Doc. 37-

4 at 2.) Significantly, however, a similar statement is in the Joint Statement of Undisputed Facts, which was authorized by Plaintiff's counsel. (*See* Doc. 36-2 at 3, UMF 11.) Thus, Plaintiff's objection to the statement is **OVERRULED**.

### B. Defendant's objections

Defendant objects to several statements in the declarations filed by Plaintiff and Morgan Ricketts for lack of personal knowledge, hearsay, and impermissible lay opinion. (Doc. 39-2.) Rule 602 provides a witness may not testify unless "the witness has personal knowledge of the matter." Fed. R. Evid. 602. A lay witness may testify only as to those opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Significantly, however, the statements identified by Defendant, which relate primarily to the weather conditions the day Plaintiff fell at Pivox Corporation and how the company reacted to the injury, are not relevant to the issues before the Court. Therefore, Defendant's objections are **MOOT**.

### C. Speculative and conclusory statements

To the extent that statements offered by either party are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis. *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp.2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context.") (citation omitted, emphasis in original).

## V. Undisputed Material Facts

Sturgeon is a company that "provides oil field construction and maintenance services." (UMF 3.) At the time of Plaintiff's termination on August 10, 2012, he worked as a foreman for Sturgeon. (UMF 4.) Plaintiff "had stop work authority, meaning that if he believed the conditions were unsafe due to weather or other reasons, he could stop work on the jobsite." (UMF 8.)

After his termination, Plaintiff obtained employment through an agency that sent him to work for Ken Small Industries. (Blackburn Decl. ¶ 19.) Plaintiff continued to look for permanent work, and

on October 8, 2012, Plaintiff began to work as an operator for Pivox Corporation, which "provides oil field construction and engineering services." (Blackburn Decl. ¶ 19; UMF 5-6.) On October 22, 2012, Plaintiff reported for work at a Pivox location, which he "believed . . . was unsafe due to the weather conditions." (UMF 9.) Plaintiff and his coworkers complained to the foreman regarding the "wind and rain" but were directed to work. (Doc. 37-2 at 8, Blackburn Decl. ¶ 29.) Around 8:30 a.m., Plaintiff "fell while walking at the jobsite, which caused him to suffer a broken and dislocated knee, a torn anterior cruciate ligament, and a fractured femur." (UMF 10.) As a result of his injuries, Plaintiff "has incurred medical expenses and experienced pain, suffering, and emotional distress." (UMF 12.)

Plaintiff remains employed by Pivox but is not able to work. (UMF 11.) As of November 1, 2012, Plaintiff's ability to work is classified as "[m]odified duty with restrictions of sit down job only, must use crutches to ambulate, no driving commercial vehicles." (UMF 18.) Consequently, Plaintiff is on Temporary Total Disability Status and he "currently receives workers compensation benefits." (UMF 11, 19.) If Plaintiff suffered the same injury while employed by Sturgeon, he "would not have been entitled to leave with pay; he would have been on temporary disability status with workers' compensation." (UMF 20.)

**VI.   Discussion and Analysis**

Because Defendant's motion for summary adjudication relates to the damages that may be recovered, the parties agree the Court should presume, for this motion only, the termination from Sturgeon was unlawful. (Doc. 36 at 8; Doc. 37 at 7.) Even assuming the termination was unlawful, Defendant argues (1) "Sturgeon is entitled to judgment in its favor eliminating the damages claims for emotional distress, medical bills, and pain and suffering" and (2) Sturgeon is "entitled to judgment in its favor eliminating any backpay damages from the date of injury until Blackburn is returned to normal duties." (Doc. 36 at 8-9.)

**A.   Damages available**

In his first amended complaint, Plaintiff brings causes of action under the FMLA (First and Second Claim for Relief), CFRA (Third and Fifth Claim for Relief), FEHA (Fourth, Fifth and Sixth Claim for Relief), a claim for wrongful termination in violation of public policy (Seventh Claim for

Relief), a claim for intentional infliction of emotional distress (Eighth Claim for Relief) and a claim for defamation (Ninth Claim for Relief).

### i.   FMLA

Under the Family and Medical Leave Act, the measure of monetary damages is

> (i) the amount of—
>   (I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or
>   (II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee;
>     (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and
>     (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively;  . . .

29 U.S.C. § 2617(a)(1)(A).  Punitive, consequential and nominal damages as well as damages for emotional distress are not recoverable under the FMLA.  *Johnson v. Dollar Gen.*, 778 F.Supp.2d 934, 951 (N.D. Iowa 2011).  Thus, Plaintiff may not recover for the physical or emotional injuries sustained at Pivox because they are in the nature of consequential damages (*Nero v. Indus. Molding Corp.*, 167 F.3d 921, 930 (5th Cir. 1999)) and because, under federal law, Plaintiff's period of disability precludes an award of damages (see discussion below regarding backpay).  Moreover, because Plaintiff admits he earned the same wage at Pivox (Doc. 37-2 at 6) his wage loss ended in October 2012, upon this employment there. 29 U.S.C. § 2617(a)(1)(A).

### ii.   CFRA/FEHA/Wrongful Termination

With respect to Plaintiff's state law claims, "a federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n. 2 (9th Cir.2000); see also *Mangold v. California Public Utilities Commission*, 67 F.3d 1470, 1478 (9th Cir.1995) ("The *Erie* principles apply equally in the context of pendent jurisdiction."). When a federal

court has diversity jurisdiction, it applies state substantive law and federal procedural law and, therefore, so too when exercising supplemental jurisdiction. (*In re Larry's Apartment, L.L.C.*, 249 F.3d 832, 837 (9th Cir.2001).

When determining whether damages stem from an intentional tort, the proper test is the substantial factor test. *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008) ("California employs the 'substantial factor' test for determining causation in intentional torts cases."); (*Soule v. General Motors Corp.*, 8 Cal.4th 548, 572 (1994) ("A tort is a legal cause of injury only when it is a substantial factor in producing the injury.") Consistent with this, for example, CACI 2600 requires, as an essential element of the tort of violation of CFRA rights "That [name of defendant]'s [decision/conduct] was a substantial factor in causing [name of plaintiff]'s harm." This is true is other intentional torts relevant here. (CACI 2433; CACI 2505; CACI 2521A; CACI 2527)

The California Supreme Court noted, "The substantial factor standard . . . has been embraced as a clearer rule of causation—one which subsumes the "but for" test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact." *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 969 (1997). Courts have held that the defense asserting intervening acts does not apply to intentional torts except where there is a break in the "*factual chain of causation.*" *Tate v. Canonica*, 180 Cal.App.2d 898, 907 (1960).

California Civil Code section 3333 sets forth the measure of damages for intentional torts as, "the amount which will compensate for all the detriment **proximately caused** thereby, whether it could have been anticipated or not." (Emphasis added). Thus, whether the particular harm suffered was foreseeable, if the employer's action was a substantial factor in the employee suffering the harm, damages may be awarded. Notably, however, these damages are not awardable where the employer's action was not the proximate cause of the harm.

To recover for his knee injury suffered at Pivox, Plaintiff creates a novel legal theory in which he asserts that a person who is wrongfully terminated may recover for any injuries he suffers at a subsequent job for as long as the job is inferior in terms of pay, duties, authority and locale. Notably in doing so, he provides absolutely no legal authority for this proposition. (Doc. 37 at 20-22) Despite this position, courts do not determine that all damages—no matter how remote from the intentional

tort and no matter the later acts of the plaintiff or others which give rise to the plaintiff injury—are recoverable merely because the plaintiff suffered an intentional tort in the past.

Notably, in *Brewer v. Teano*, 40 Cal.App.4th 1024, 1036 (1995), the Second District court of Appeal disagrees. The *Brewer* court observed,

> The pleading alleges "reckless" conduct by Teano, and it specifically claims that he repeatedly caused his car to collide with appellant's vehicle. This comes close to pleading an intentional tort. From that prospect, the doctrine of superseding cause is less likely to cut off the chain of events put in motion by the original conduct of the tortfeasor. (See Tate v. Canonica (1960) 180 Cal.App.2d 898, 906, 5 Cal.Rptr. 28; Lopez v. Surchia (1952) 112 Cal.App.2d 314, 318, 246 P.2d 111; Ray Wong v. Earle C. Anthony, Inc. (1926) 199 Cal. 15, 18, 247 P. 894; §§ 435B, 870; 6 Witkin, Summary of Cal. Law, supra, § 1323, p. 781 ["The modern tendency is to impose broader liability for consequences where the defendant was guilty of an intentional wrong than where his conduct was merely negligent."].) **Nevertheless, as these authorities indicate, even the "but for" consequences of an intentional tort are not without limitation.**

Emphasis added. As noted above, *Tate* requires that the "factual chain of causation" not be broken in order for damages to be recoverable from an intentional tort. *Tate*, 180 Cal.App.2d at 907. In *Lopez v. Surchia*, the court found, "In other words, if the defendant did an illegal act which was likely to prove injurious to another, he is answerable for the consequence **which directly and naturally resulted** from the conduct, even though he did not intend to do the particular injury which followed." *Lopez*, 112 Cal.App.2d 314, 318 (1952), emphasis added. Likewise, the court observed, "The general rule of law is that whoever does an illegal or wrongful act is answerable for all the consequences that ensue in the **ordinary and natural course of events**, though those consequences be immediately brought about by intervening agents, **provided such agents were set in motion by the primary wrongdoer**, or provided those acts causing the damage were the **necessary or legal and natural consequence** of the wrongful act." *Ray Wong v. Earle C. Anthony, Inc.,* 199 Cal. 15, 18 (1926).

Recently in *Ash v. N. Am. Title Co.*, 223 Cal.App.4th 1258 at *1275-76 (2014), reh'g denied (Mar. 5, 2014), the court questioned the idea that analysis of superseding and intervening causes should not be undertaken when evaluating damages associated with intentional torts and observed that at least one learned treatise asserts to the contrary. The court not quoted Wright, Symposium, *Baseline and Counterfactuals in the Theory of Compensatory Damages: What Do Compensatory Damages Compensate?* (2003) 40 San Diego L.Rev. 1425, 1478 which asserted, "The superseding cause limitation applies to all tort actions, including the intentional torts." The Ash court failed to note that

11

other learned scholars have determined in the context of wrongful termination cases that, "Although foreseeability is not required . . . it must be shown in each case that the particular damages claimed would not have been suffered "but for" the employer's tortious conduct or statutory violation, **and that there was no intervening, superseding cause.**" *Cal. Prac. Guide Employment Litigation* Ch. 17-C, emphasis added. In so asserting, the Rutter Group authors relied upon *Green v. American Broadcasting Cos., Inc.*, 647 F.Supp. 1359, 1364 (D DC 1986).

In *Green,* the plaintiff sued for harassment and discrimination. *Green*, at 1361. She claimed also that after she filed a complaint alleging these actions, she was fired in retaliation. Id. As part of her damages, she alleged the employer intentionally subjected her to emotional distress. Id. In granting summary judgment as to this damage claim, the court determined that the plaintiff failed to prove that the employer's action was a proximate cause of her emotional distress which the court attributed instead, to a serious car accident occurring a year before her firing. Id. at 1364. Thus, as Defendant observes, "a plaintiff must demonstrate both actual and legal cause," because "there can be no liability for the wrongful discharge without a causal connection between the discharge and the injury." (Doc. 36 at 11, quoting *Jasper v. H. Nizam, Inc.*, 764 N.W. 2d 751, 770 (Iowa 2009)).

When Plaintiff slipped in October 2012, he suffered a knee injury. Such an injury is different in kind from the emotional and financial damage that is a normal, natural or direct consequence of a wrongful termination decision. There is no indication that Sturgeon played any role in the wet conditions existing on the day of the injury or in the decision to continue to work despite these conditions or that Sturgeon set these events in motion. At most, Sturgeon's action ensured only that Plaintiff would not be working at a Sturgeon job site on October 8, 2012; the Court finds this to be insufficient as a matter of law.[2]

Nevertheless, Plaintiff argues his injuries "would not have occurred if he were still a foreman" at Sturgeon, and had not been employed by Pivox. (Doc. 37 at 13, emphasis omitted.) Plaintiff asserts: "The only reason [he] was not working as a foreman that day was because he was terminated from his foreman position at Sturgeon," and as a result "Sturgeon concedes that [he] would not have

---

[2] Because the Court concludes the factual chain of causation was broken, the Court need not consider whether, despite knowing of the risks of walking on the plastic, Plaintiff assumed the risk of doing so.

12

been injured had it not terminated him." (*Id.*) However, Sturgeon makes no such concession. Rather, Sturgeon argues the company "was not the cause in fact, or the legal cause, of [Plaintiff's] injury at Pivox." (Doc. 36 at 9, emphasis omitted.)

Notably, despite Plaintiff's thesis that his injury occurred only because he was not acting as the foreman on the date of the injury, he admits that even at Sturgeon he was required "to operate a machine or perform manual labor approximately 5% of the time . . ." (Doc. 37-2 at 2) Thus, there is no assurance that having the role of foreman would have protected him from injury. Likewise, when Plaintiff worked at Sturgeon as a foreman, he was required to contact his supervisor for approval to stop work due to weather conditions and that Plaintiff's supervisor had the authority to overrule Plaintiff's request, though he had never done so. Id. at 4. This is not different than at Pivox where Plaintiff's supervisor, Mike, was required to ask his own supervisor for permission to stop work. Id. at 8. Thus, again, the fact Plaintiff had acted as the foreman 95% of the time at Sturgeon does not mean that a natural and direct consequence of his firing was that he would be placed at greater risk of injury.

Given these facts, the Court concludes that the factual chain of causation stemming from Plaintiff's firing was broken and determines Sturgeon was not a legal cause of Plaintiff's knee injury. Thus, he is not entitled to damages from Sturgeon related to the injuries suffered while working for Pivox.

**B. Backpay**

Plaintiff contends that "even if Sturgeon was not the but-for cause of [his] injury, Sturgeon is still responsible for [his] lost wages." (Doc. 37 at 14, emphasis omitted.) As to the federal claims, the "general rule" is that "an employer is not liable for backpay during periods that an improperly discharged employee is unavailable for work due to a disability." *EEOC v. Timeless Invs., Inc.*, 734 F.Supp.2d 1035, 1059 (E.D. Cal. Aug. 13, 2010) (citing *Canova v. NLRB*, 708 F.2d 1498, 1505 (9th Cir. 1983)).

In *EEOC*, one plaintiff claimed damages for lost wages despite that he had sought and was awarded, social security benefits based upon his inability to work. *Id*. at 1059. In rejecting that damages for lost wages should be awarded, the Court noted, "a plaintiff should not be able to receive back pay for a period when he was unable to work for reasons unrelated to the defendant's conduct." *Id.*

Only where the defendant's discriminatory conduct caused the disability at issue is back pay awardable. *Id.* (citing *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999); *McKenna v. City of Philadelphia*, 636 F. Supp. 2d 446, 465 (E.D. Pa. 2009)).

Despite this authority, Plaintiff relies upon *Martin v. Dep't of Air Force*, 184 F.3d 1366, 1370 (Fed. Cir. 1999), to argue that he is entitled to back pay despite that he remains unable to work. In *Martin*, the plaintiff had been an aircraft mechanic but was terminated from that position. *Id*. at 1367. He worked at several different jobs after the firing and was finally hired by a car dealership as a "wrecker driver/mechanic." *Id*. at 1367-1368. One day at work, another employer back-ended the car the plaintiff was driving. *Id.* He suffered injuries for which he was provided workers compensation benefits. *Id*. When the plaintiff was reinstated to his job as an aircraft mechanic, he was denied back pay under the Back Pay Act for the period of time he received workers compensation benefits. *Id*. at 1368.

In considering his administrative claim, the agency noted that under the Act, back pay could not be awarded to an employee unless he was "ready, willing, and able to perform his or her duties . . ." *Martin* at 1368-1369. The agency determined that any other interpretation would provide the employee with a windfall. *Id*. at 1369. On appeal, the Court interpreted the Back Pay Act and found that the purpose of the Act was to make the employee whole and to restore the wrongfully discharged employee to the position he would have been in had the termination not occurred. <u>Id</u>. at 1372. In determining Martin should receive back pay, the court held, "Martin's injury was closely related to the nature of his interim employment and was not a 'hazard of living generally.' In order to be made whole, as is the intent of the Back Pay Act[3], Martin should be awarded back pay for the time he suffered an 'abnormal' interim work-related injury." *Id*. at 1372.

The *Martin* court relied upon *Am. Mfg. Co. of Texas*, 167 NLRB 520, 522 (1967), in which the plaintiff had been a truck driver who hauled "pumping equipment, pipe, military shells, scrap metal, bentonite "mud," and billet steel." *Id*. at 523. His replacement position, as a truck driver, required him to "haul and unload pipe by spilling it to the ground." *Id*. One day, when attempting to "spill" his load,

---

[3] There is no showing that Plaintiff is covered by the Back Pay Act and, given he was employed by a private, non-governmental company, it seems apparent he is not so covered. 5 U.S.C. § 5596.

a section of pipe gave way and he had to jump to safety. *Id*. In doing so, he fractured his foot and was unable to work for a month. *Id*. The Board observed,

> Jumping off collapsing loads is not an everyday occurrence and it is questionable, at best, that Wallace would have been required to do so absent his discharge. It is not probable, even though it was possible, that he could have been in that position in any event, and as this particular injury is closely related to the nature of the interim employment, we shall not exclude this period of Wallace's disability from backpay. However, since we are not tolling his backpay for that period, that portion of the workmen's compensation payments to Wallace which were in replacement of lost wages shall be included in his interim earnings and be deducted from the gross backpay.

*Id*.

Here, there are no facts which explain the circumstances of Plaintiff's injury. The undisputed facts proffered by Plaintiff indicate only that he was injured about 30 minutes into the workday after he slipped on a wet piece of plastic (PUDF 8, 9) under which Plaintiff "guess[ed] . . . was a mudhole." (Doc. 37-2 at 8 (Blackburn Decl. ¶ 33)) Plaintiff provides no explanation as to what work he was doing the day he was injured or how his slipping was related to that work. Plaintiff explains only that he was hired as an equipment operator but his new employer wanted to get to "know [him] and his abilities" before allowing him to work as an operator, which, Plaintiff explains, is what he would have done if the positions were reversed. *Id*. at 6 (Blackburn Decl. ¶ 21), While his employer was getting to know him, Plaintiff was assigned "to pick up asphalt, sweep and keep the job site clean, dig ditches, put up fencing, organize the storage area, went to Home Depot and [got] supplies" and he "operate[d] an excavator for about four hours per week." *Id*. at 7-8 (Blackburn Decl. ¶ 21).

As to the incident, Plaintiff reports only, " . . . around 8:30 a.m., I slipped and fell on plastic we had laid down over the wet surface, because I guess there was a mudhole underneath it, and I heard a popping sound in my leg." *Id*. Seemingly, Plaintiff contends that the fall occurred, not because of rain water collecting on the surface of the plastic, but because the plastic was placed on a mudhole. Exactly how or why this caused the fall is not explained. However, at the hearing, the Court asked, "On this day, what were his job duties?" Counsel responded, "Generally getting supplies, sweeping the job site, keeping it clean, maybe putting up fencing, digging ditches, manual labor." (Doc. 42 at 26) Plaintiff's declaration was consistent; "my job duties were pretty straight up manual labor, even though I was hired as an operator." (Doc. 37-2 at 7)

Plaintiff fails to provide sufficient factual information that his injury occurred due to his performing acts closely associated with his work on that day.[4]  At most, Plaintiff alleges only that he fell while on the job site.  Whether he was on his way to the coffee truck, to use the restroom or was in process of actually performing the duties of his job is not shown.  Even still, Plaintiff offers little explanation why the Court should depart from the authority from this District and Circuit and the Court cannot find a reasoned basis to accept the analysis of *Martin*.  In the Court's view, this authority offers little in the way of logic[5] and, seemingly, ignores well-established rules of causation.  Here, the Court does not find Defendant was the legal cause of Plaintiff's injury.  Thus, during the period of disability, Plaintiff was/is unavailable to work and cannot recover lost wages for this time for the federal claims.

On the other hand, Plaintiff raises claims under state law as well and argues that the award of back pay as to those causes should be evaluated under state law.  According to Plaintiff, pursuant to California law he is entitled to recover back pay because when an employer wrongfully terminates an employee, "the employer cannot take advantage of the fortuitous circumstance of a disability of the employee during the period of discharge without first having purged itself of its own wrong by offering to reinstate the employee." (Doc. 37 at 16, quoting *Mayer v. Multistate Legal Studies, Inc.*, 52 Cal. App. 4th 1428, 1434-1435 (1997)).

In general, under California law, backpay is equitable relief that "serves to make an employee whole for the employer's wrongdoing." *Davis v. Los Angeles Unified School Dist. Personnel Com.*, 152 Cal.App.4th 1122, 1133 (2007).  It provides the employee what he would have earned had he not been terminated.  *Id*. at 1133 quoting *Lisec v. United Airlines, Inc.*, 10 Cal.App.4th 1500, 1503 (1992).

Consequently, a wrongfully terminated employee "will not be allowed back pay during any periods of disability." *Davis*, 152 Cal. App. 4th 1134.  The court explained "an employer is not liable for backpay during periods that an improperly discharged employee is unavailable for work due to a

---

[4] The Court declines to consider the evidence submitted in support of Plaintiff's motion for reconsideration. (Doc. 43)  He fails to explain the inconsistencies between his earlier declaration and his current one or the statements of counsel at the hearing which directly contradict this new declaration. *Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1231 (9th Cir.1995).

[5] Rather than considering the legal standard for causation, *Martin* imposes liability on the former employer for back pay for an employee hurt at a replacement job but does impose liability as to an employee who cannot find replacement work despite diligence; this makes no sense.  Neither employee would be at the place where the injury occurred or doing the thing which gave rise to the injury, had each not been fired.

16

disability," but "full backpay may be awarded where the disability is a result of the employer's wrongful conduct." *Id.* at 1134-35 (citing, *e.g., Canova v. NLRB*, 708 F.2d 1498, 1505 (9th Cir. 1983); *Martin v. Dep't of Air Force*, 184 F.3d 1366, 1371–1372 (Fed. Cir. 1999)).

The *Davis* court considered its ruling made sixty years before in *Ahlstedt v. Board of Education,* 79 Cal.App.2d 845 (1947). In *Ahlstedt,* the court recognized two principles:

> First, a discharged employee is entitled to full backpay if his or her illness is caused by the employer's wrongful conduct. Second, if the employee remains ready, willing, and able to return to work while ill, the employer's wrongful conduct—not the employee's illness—is the cause of the lost earnings, and the employer is not prejudiced by having to make full restitution.

*Davis*, 152 Cal. App. 4th at 1137. Explaining its prior holding in *Ahlstedt*, the *Davis* court stated: "[i]n *Ahlstedt*, we did not mean to suggest that in *all* cases, the discharge is the cause of the employee's lost earnings or that the employer is liable for full backpay regardless of events occurring after the discharge." *Id.* at 1138 (emphasis in original). However, *Davis* noted that this was the incorrect interpretation given to *Ahlstedt* by the Fifth District Court of Appeal in *Carroll*, 31 Cal.App.3d 561 (1973).

In *Carroll*, a county employee had been discharged and during the period before his reinstatement, he spent 147 days in jail for public drunkenness. *Carroll*, 31 Cal.App.3d at 564. In arguing back pay should not be awarded, the county noted that the employee could not have reported to work and would not have been paid during that time even if he had not been discharged. *Id*. at 565. However, *Carroll* determined the plaintiff was entitled to his full salary, including the time he was incarcerated, minus the wages he received for working while in jail. *Id.* at 566-567. *Davis* rejected the rationale of *Carroll*, by stating,

> We agree with *Carroll* that an employer cannot take advantage of a discharged employee's disability, at least where the disability is caused by the discharge. Further, courts should hesitate to adopt a rule that encourages a discharged employee to stand idly by, hoping to be reinstated, as opposed to seeking a comparable job with another employer. Yet we fail to see how *Carroll* furthered either of those interests. The employee's incarceration was not attributable to his discharge. And the denial of lost earnings during jail time would not encourage discharged employees to avoid other employment. If anything, it would discourage them from committing crimes. Nor do we agree with *Carroll's* statement that an employee is entitled to full back pay unless and until an offer of reinstatement is made. That notion disregards well recognized principles of causation, gives the employee a windfall, and ignores the circumstances that may exist between the time of discharge and reinstatement. A back pay award should reflect the particular facts of the case. To the extent Carroll is inconsistent with *Ahlstedt*, we decline to follow it. (Cf. *Hoffman Plastic Compounds, Inc. v. NLRB*

(2002) 535 U.S. 137, 147–152, 122 S.Ct. 1275, 1282–1285 [employees wrongfully selected for layoff were not entitled to back pay where they were not legally authorized to work in United States; award of back pay would encourage individuals to violate federal immigration laws].)

*Davis*, 152 Cal. App. 4th at 1138-1139

California's First District Court of Appeal addressed similar issues in *Mayer v. Multistate Legal Studies, Inc.*, 52 Cal. App. 4th 1428 (1997). The court determined that an employer is entitled to a set-off for the amount of disability payments that were intended to compensate the wrongfully discharged employee for lost wages. Notably, in *Mayer*, the evidence did not establish the employee was totally disabled though the physical manifestations of the chemotherapy treatments left him in a condition which made it unlikely he could obtain substitute work. *Id*. at 1436. After discussing *Ahlstedt* and *Carroll*, the court noted,

> . . . we are convinced that the equities in the present case militate strongly against permitting plaintiff's receipt of disability compensation to wholly preclude any award of lost wages from defendant. First, to accept the trial court's ruling would force future employees finding themselves in positions similar to this plaintiff to make an unacceptable election, i.e., accept benefits needed for survival in the present or pursue a more lucrative claim against the employer that may not come to fruition for several years. This unacceptable choice contravenes the policies underlying the Legislature's decision to make disability compensation available in the first place. "The purpose of [disability compensation] is to compensate in part for the wage loss sustained by individuals unemployed because of sickness or injury and to reduce to a minimum the suffering caused by unemployment resulting therefrom. This part shall be construed liberally in aid of its declared purpose to mitigate the evils and burdens which fall on the unemployed and disabled worker and his family." (Unemployment Ins.Code, § 2601.)

*Id*. at 1435-1436. Thus, the *Mayer* court awarded back pay though reduced it by the total of the disability payments, which represented wages. *Id*. at 1436.

Significantly, in contrast to *Mayer*, Plaintiff's injury left him completely unable to work at least for a period of time. Likewise, Plaintiff's situation is different from that in *Ahlstedt* where the wrongful termination caused the illness which made the employee unable to work. Moreover, the Court agrees that the rationale of *Carroll* is faulty in that it seeks to impose liability for damages on a defendant who did not cause the disability.

This determination is consistent with California law which precludes backpay if it "would provide the plaintiff with an unjustified windfall." *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 223

(2013). The Fair Employment and Housing Act "does not provide authorization to award damages that reflect the significant possibility of a windfall." *Id.* at 234.

Here, as noted above, Plaintiff suffered an injury which was unrelated to the termination decision of Sturgeon. Thus, Plaintiff is not entitled to backpay damages from Defendant for his period of disability for his claims arising under California law.[6]

**ORDER**

Based upon the foregoing, the Court **ORDERS**:

1. The Court's previous order granting partial summary judgment (Doc. 41) is **WITHDRAWN**;

2. Defendant's motion for partial summary judgment (Doc. 36) is **GRANTED.**

IT IS SO ORDERED.

Dated:   **March 27, 2014**                    /s/ Jennifer L. Thurston
                                               UNITED STATES MAGISTRATE JUDGE

---

[6] Notably, when he started working for Pivox, he was earning the same hourly rate as he earned at the time he was terminated from Sturgeon. (Doc. 37-2 at 6 [Plaintiff's Dec. ¶ 20]) Because there are factual questions that cannot be resolved by the Court, the Court cannot find—as Plaintiff requests—that the job with Pivox was not comparable to the one he held at Sturgeon such to preclude any reduction in damages for the salary earned while at Pivox. *Villacorta v. Cemex Cement, Inc.*, 221 Cal.App.4th 1425, 1428-1429 (2013).